WILLIAM H. DOYLE, ARIZONA BAR NUMBER 007285
BRANDON D. MILLAM, ARIZONA BAR NUMBER 034696
DOYLE HERNANDEZ MILLAM
11811 N. TATUM BLVD., SUITE 2900
PHOENIX, ARIZONA 85028
TELEPHONE: (602) 240-6711
FACSIMILE: (602) 240-6951
WDOYLE@DOYLELAWGROUP.COM
BMILLAM@DOYLELAWGROUP.COM
FIRM EMAIL: ALG@DOYLELAWGROUP.COM

ATTORNEYS FOR DEFENDANT

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Hailei Joe, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>Olive Branch Assisted Living, LLC, an Arizona limited liability company,<br><br>Defendant. | NO. 2:23-cv-02154-PHX-SRB<br><br>**DEFENDANT OLIVE BRANCH ASSISTED LIVING, LLC'S MOTION FOR SUMMARY JUDGMENT** |

Defendant Olive Branch Assisted Living, LLC ("Olive Branch") hereby moves for summary judgment pursuant to Fed. R. Civ. P. 56. This Motion is supported by the following Memorandum of Points and Authorities and by the accompanying Separate Statement of Facts ("OB SSOF").

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   FACTUAL BACKGROUND:**

Plaintiff's claims against Olive Branch center around her 17-day stay at Olive Branch's Behavioral Health Residential Facility between October 18, 2022 and November 7, 2022. Olive Branch was not fully operational as a Behavioral Health Residential Facility until

August 11, 2022. [OB SSOF #1] During Olive Branch's initial licensing process, Olive Branch contracted with (non-party) Teri's Health Services ("THS") to provide counseling, psychiatric, primary care, and psychological services to Olive Branch's residents on January 13, 2022. [OB SSOF #2] As Olive Branch's contracted Behavioral Health Provider ("BHP"), THS would conduct an intake assessment and prepare a treatment plan within 24-48 hours for new residents. As noted in THS' contract with Olive Branch, THS' purpose as a BHP was, as follows:

- To give clinical direction to the facility
- To address treatment concerns
- To direct treatment and clinical decision making
- To provide oversite to the Facility and staff
- To address concerns regarding clinical needs

[OB SSOF # 4 – 8] Additionally, THS would "provide case management services through an on staff case manager working with our team and will work with [Olive Branch] to help address needs and discharge plan as needed." [OB SSOF #9] THS also assisted Olive Branch with drafting its Policies and Procedures. [OB SSOF #10] Section 10 of Olive Branch's Policies and Procedures, entitled "Discharge & Transfer," specifies that "a resident will be discharged from BHRF when… [a]ssessment indicates that the resident may be a danger to self or others without stabilization in a higher level setting." [OB SSOF #11]

Olive Branch's facility could house up to 10 Residents at a time. [OB SSOF #12] At the time of the incident related to the instant lawsuit, there were six other Residents (besides Plaintiff) residing at Olive Branch. [OB SSOF #13]

On October 18, 2022, at approximately 10:14 a.m., Olive Branch notified THS that Plaintiff Hailei Joe was being picked up by Olive Branch's employee (Jose "Pedro" Garcia). [OB SSOF #14] Plaintiff was transported from her grandmother's home in Page, Arizona to

Olive Branch's facility in Casa Grande, Arizona. [OB SSOF #15] An Olive Branch Resident, Micah Kelley, was a passenger in the car at the time. [OB SSOF #16] During the trip, Plaintiff disclosed to both Mr. Garcia and Ms. Kelley that she suspected she had recently contracted HIV. [OB SSOF #17]

On October 18, 2022, at approximately 8:24 p.m., Olive Branch notified THS that Plaintiff had arrived at the facility. [OB SSOF #18] THS replied via text message that someone would call soon. [OB SSOF #19] In a follow up text message sent shortly thereafter, THS confirmed they had talked to Plaintiff and advised Olive Branch that Plaintiff informed THS that she had "used heroin as recently as today." [OB SSOF #20]

On October 19, 2022, at approximately 7:53 a.m., Olive Branch requested that THS set up Plaintiff with both a PCP and Psych. [OB SSOF #21 - 22] In response, THS set up Plaintiff with appointments for both a PCP and Psych. [OB SSOF #23] That same day, Olive Branch provided Plaintiff with several intake documents. [OB SSOF #24] In those documents, Plaintiff advised that her purpose for treatment was for "Narcotics, PTSD." [OB SSOF #25] The residential intake form also requested additional information concerning Plaintiff's primary care provider, medical or health diagnoses, as well as "any additional information to assist agency in providing better healthcare." [OB SSOF #26]. No information was provided from Plaintiff concerning any other "Medical or Health Diagnoses" and no "additional information" was provided to Olive Branch to assist them" in providing better healthcare." [OB SSOF #27]

Plaintiff was also provided with a "Resident Onboarding Packet" which included a "Resident Manual" and a list of "Resident Rights." [OB SSOF #28] Plaintiff confirmed that she received these materials with her signature, dated October 19, 2022. [OB SSOF #29] The materials included a copy of a "Resident Grievance/Complaint Form" as well as specific instructions for "Grievance Procedure[s]." [OB SSOF #30]. Plaintiff confirmed (with her

initials) that she received these materials and that she understood the "Grievance Procedure." [OB SSOF #31] As noted in the Grievance Procedure[s]":

> "If a resident or resident's representative feels unfairly treated or has a complaint, the resident or resident's representative shall first discuss it with the manager. It may be a case of misunderstanding which can be straightened out by frank discussion."

[OB SSOF #32] At no point in time in this case has Plaintiff ever prepared, filled out, or otherwise provided Olive Branch with a Residence Grievance/Complaint. [OB SSOF #33]

On October 20, 2022, Plaintiff was seen by THS provider, Melissa Zuber, FNP[1], to establish care with a primary care physician. [OB SSOF #34] THS ordered STD Panels and other lab work associated with establishing Plaintiff's medical care. [OB SSOF #35] THS staff noted in Plaintiff's medical records that Plaintiff's "[l]ast day of use was three days ago" and that the "site on right forearm is hardened and bruised." [OB SSOF #36]

On October 20, 2022, Plaintiff was seen by THS provider, Caroline Morris, CRNP[2], to establish psychiatric care. [OB SSOF #37] THS staff noted the following observations: Plaintiff reported body aches all over (noted as Detox symptoms); Plaintiff had attempted suicide in June 2022 when she tried to run a car into a wall; Plaintiff had been held hostage and raped by her partner in July 2022; Plaintiff has been off her medications for approximately one month; and, Plaintiff attempted suicide two weeks ago by trying to starve herself for a week. [OB SSOF #38]

Plaintiff has alleged that Olive Branch failed to provide Plaintiff with any HIV testing. [OB SSOF #39] THS records demonstrate that Plaintiff's allegation against Olive Branch is objectively false. On October 26, 2022, at approximately 11:04 a.m., Central Clinical Labs collected samples from Plaintiff. [OB SSOF #40] THS employee, Melissa Zuber, FNP, is listed as the ordering "PHYSICIAN" on the lab reports generated by Central Clinical Labs.

---

[1] Family Nurse Practitioner.

[2] Certified Registered Nurse Practioner.

[OB SSOF #41] Plaintiff's STI results for Chlamydia and Gonorrhea were made available one day later, on October 27, 2022, but HIV testing was not reported by Central Clinical Labs until 4:06 PM on October 31, 2022. [OB SSOF #42] THS received Plaintiff's HIV test results via Fax transmission on October 31, 2022 at 6:17 PM. [OB SSOF #43]

On October 28, 2022, Plaintiff had an appointment with THS and was advised by THS' employee (Melissa Zuber) that some of her labs had not yet been resulted. [OB SSOF #44] At the same visit, Plaintiff complained of restless leg syndrome and advised she was out of medication. [OB SSOF #45] A one week follow up appointment was then set to review labs. [OB SSOF #46]

Olive Branch did not participate and/or attend Plaintiff's appointments with THS, but Olive Branch did assist in both the scheduling and coordination of Plaintiff's appointments with THS. [OB SSOF #47] Although Olive Branch did not participate in those appointments, Olive Branch and THS would consistently communicate with one another via group messages concerning Plaintiff's status and ongoing medical needs. [OB SSOF #48] Consistent with its Policies and Procedures, Olive Branch would maintain a complete and current case record for each resident, which included Plaintiff's medical records from THS. [OB SSOF #49]

On November 4, 2022, at Plaintiff's scheduled follow up appointment with THS to discuss lab results, Plaintiff was advised that she tested positive for HIV. [OB SSOF #50] After the appointment, Plaintiff was observed crying in the common areas of the Olive Branch home and was asked by an Olive Branch employee (Jose "Pedro" Garcia) what was wrong. [OB SSOF #51] Plaintiff then told Mr. Garcia that she was HIV positive. [OB SSOF #52] Mr. Garcia then responded, "It's okay. Go take a nap. It will make you feel better." [OB SSOF #53]

Shortly thereafter, Mr. Garcia reported what he had heard to Olive Branch's Administrator, Anissa Diaz. [OB SSOF #54] Ms. Diaz then contacted Olive Branch's owner,

Russell Appleton, because Olive Branch "did not have a policy and procedure for HIV" and because "she had not dealt with the issue before in her previous work." [OB SSOF #55] Mr. Appleton then told Ms. Diaz to call the BHP (THS) so that they could discuss the next steps. [OB SSOF #56]

Ms. Diaz then contacted her "team" (comprised of Olive Branch and THS Staff) to advise them as to what occurred and for support on how to handle the issue. [OB SSOF #57]. Ms. Diaz also sent texts directly to THS' owner, Teri Hourihan, seeking additional guidance because Ms. Diaz had never encountered this situation before. [OB SSOF #58]

Shortly thereafter, Mr. Appleton called a meeting with Olive Branch Staff (Anissa Diaz and Jose Garcia), THS Staff (Michaela Halwachs) and Olive Branch's residents. [OB SSOF #59] At that meeting, Mr. Appleton announced that there was a positive diagnosis of HIV in the house and that the facility was working on putting in some protocols. [OB SSOF #60] Mr. Appleton has testified that, at the time he called the meeting, he did not know what the prerequisites for managing someone with HIV were and sought guidance from THS. [OB SSOF #61] Mr. Appleton also confirmed that Olive Branch did not have any protocols in place for HIV on November 4, 2022. [OB SSOF #62]

At her deposition, Plaintiff confirmed that Mr. Appleton announced that there was a positive diagnosis of HIV in the house and that everybody needed to take precautions. [OB SSOF #63] Plaintiff testified that Mr. Appleton told everyone he was obligated to tell everybody in the house. [OB SSOF #64] Plaintiff also confirmed that Mr. Appleton did not identify and/or otherwise make it obvious to those in attendance at the meeting that the individual diagnosed with HIV was Plaintiff. [OB SSOF #65]

At or around the time the meeting concluded, Plaintiff announced to everyone that she was the person that had been diagnosed with HIV. [OB SSOF #66] At some point during the day, Mr. Appleton recorded a daily progress note recording his conversation with Plaintiff

shortly after the house meeting. [OB SSOF #67] Mr. Appleton documented that he was concerned that Plaintiff's needs "out paces the skill or ability my team possesses." [OB SSOF #68] Mr. Appleton's daily progress note also indicated that Plaintiff understood that Olive Branch's "facility is not intended to treat drug addiction" and that Olive Branch's programming was "more focused on treating alcoholics." [OB SSOF #69] Mr. Appleton also noted that he agreed with Plaintiff that Olive Branch does require a "more robust program that balances both addictions." [OB SSOF #70] In other words, both Mr. Appleton and Plaintiff appeared to appreciate that Olive Branch's facility lacked experience in handling Plaintiff's needs.

At some point during the day, Mr. Appleton called for an emergency meeting with THS to discuss potential options and cited his concern that Olive Branch lacked provisions, rules and experience to meet Plaintiff's continued needs. [OB SSOF #71] Mr. Appleton cited additional concerns that Olive Branch was not experienced or capable in handling Plaintiff's needs after learning about Plaintiff's recent suicidal attempts and ongoing PTSD. [OB SSOF #72] THS staff (Ashley McCann and Michaela Halwachs) agreed with Olive Branch's concerns and agreed with a plan to discharge/transfer Plaintiff to another facility that could meet Plaintiff's mental and physical needs. [OB SSOF #73 - 74]

Arizona's Administrative Code states that "[a]n administrator shall ensure that a resident is discharged from a behavioral health residential facility when the resident's treatment needs are not consistent with the services that the behavior health residential facility is authorized and able to provide." Ariz. Admin. Code § 9-10-709 (C). [OB SSOF #75]

Text messages exchanged between Olive Branch and THS demonstrate that efforts were undertaken to find a new facility for Plaintiff. [OB SSOF #76] Ms. Diaz' text messages confirm that a new facility was willing to take Plaintiff right away, but Ms. Diaz pushed out

the transfer a few days to give Plaintiff "time to grief here with us where she feels safe." [OB SSOF #77]

Plaintiff has alleged that, on November 4, 2022, Mr. Appleton "told Plaintiff not to attend any outdoor field trips later that day" and "not to attend any more planned activities that involved other residents. [OB SSOF #78] Olive Branch's internal records and TikTok videos produced by Plaintiff demonstrate that Plaintiff was <u>not</u> restricted from attending outdoor field trips or interacting with other residents.

On November 4, 2022, between 2:20 p.m. and 3:50 p.m. (after Mr. Appleton's house meeting), Olive Branch documented that Plaintiff went on an outing at Lin's Buffet for lunch. [OB SSOF #79] A TikTok video produced by Plaintiff in this case confirm that Plaintiff and other Olive Branch residents went to Lin's Buffet together. [OB SSOF #80] The Tiktok video shows Plaintiff and other Olive Branch residents stuffing food from Lin's Buffet into plastic bags to eat later. [OB SSOF #81] Plaintiff has confirmed that this outing did in fact occur and confirmed that Olive Branch's employee, Anissa Diaz, was present during the outing at Lin's Buffet. [OB SSOF #82]. Additional Olive Branch records further confirm that Plaintiff was not prevented from interacting with other residents or attending outings, such as visits to the library, Walmart, group meetings, and staying up late with Residents doing Karaoke. [OB SSOF #83]. Plaintiff could not recall all of the outings that were recorded in Olive Branch's records, but did confirm that Olive Branch did not separate Plaintiff from other residents. [OB SSOF #84]

On November 7th, Plaintiff was discharged from Olive Branch and transferred to Cornerstone Healing Center. [OB SSOF #85] Olive Branch's discharge records cited the reason for the discharge was "due to not having protocols in place to continue care for client" and that Plaintiff was to "finish treatment at facility equipped to give proper care needed." [OB SSOF #86] There is no documentation or records which demonstrate that Plaintiff

affirmatively objected to the transfer or otherwise requested an accommodation from Olive Branch. [OB SSOF #87] Plaintiff signed the "Release from Residential Facility" confirming her discharge and release to Cornerstone Healing Center. [OB SSOF #88]

On April 20, 2023, Plaintiff filed a Housing Complaint of Discrimination against Olive Branch. [OB SSOF #89] In that filing, Plaintiff alleged that Mr. Appleton "informed everyone someone was recently diagnosed with a disability and the facility was no longer safe[.]" [OB SSOF #90]

On October 16, 2023, Plaintiff filed the instant Complaint against Olive Branch citing violations of the Federal Fair Housing Act, Violation of Arizona Fair Housing Act, Violation of Americans with Disabilities Act, and Public Disclosure of Private Facts. [OB SSOF #91]

On November 3, 2023, the Phoenix New Times published an article concerning the instant lawsuit. [OB SSOF #92] The article included citations from Plaintiff's lawsuit (Doc. 1) and additional statements offered by Plaintiff and her attorney. [OB SSOF #93]

Between November 13 and November 21, 2023, prior counsel for Olive Branch (Ely Sluder) engaged in back and forth email correspondence with Plaintiff's counsel concerning Arizona's Attorney General's investigation of Plaintiff's Housing Complaint, the Phoenix New Times Article, and Plaintiff's federal lawsuit. [OB SSOF #94] Plaintiff was not copied on any of the emails exchanged between counsel. [OB SSOF #95] The correspondence exchanged among counsel also included communications with Arizona's Attorney General Office's Compliance Officer, Elizabeth Amarillas. [OB SSOF #96]

In the exchanged emails, Olive Branch's counsel communicated his expectation that Arizona's Attorney General Investigation would conclude that Olive Branch had not violated Arizona's Fair Housing Act. [OB SSOF #97] At no point in the back and forth email correspondence did Olive Branch's counsel demand that Arizona's investigation into

Plaintiff's housing complaint be halted or that Plaintiff withdraw the housing complaint she had filed with the State of Arizona. [OB SSOF #98]

On December 17, 2023, Olive Branch filed a counter claim for defamation. [OB SSOF #99] As noted by Plaintiff in her Supplemental Complaint, "the alleged defamatory statements Defendant accuses Plaintiff of making are predicated largely on a Phoenix New Times article that merely repeated the allegations in Plaintiff's Complaint[.]" [OB SSOF #100] As demonstrated by the record above, Plaintiff's most serious allegations against Olive Branch (No HIV testing provided and Plaintiff banned from outings/interacting with other residents) have been proven false. [OB SSOF #101]

Despite Olive Branch's good faith belief that Plaintiff had made numerous false allegations against Olive Branch, Olive Branch stipulated to the dismissal of its counterclaim on July 23, 2024. [OB SSOF #102]

## II. LEGAL ARGUMENT:

### A. Arizona's Administrative Code Supports Olive Branch's Decision to Discharge/Transfer Plaintiff to a Facility that Could Meet Plaintiff's Higher Level of Care

Arizona's Department of Health and Human Services licensing regulations support behavioral health residential facilities' right to discharge an individual if those same facilities feel as if they are unable to provide the services that a person needs. As noted in the Arizona Administrative Code, "[a]n administrator shall ensure that a resident is discharged from a behavioral health residential facility when the resident's treatment needs are not consistent with the services that the behavioral health residential facility is authorized and able to provide." Ariz. Admin. Code § 9-10-709 (C).

In *Herriot v. Channing House*, the court relied on California's Health and Safety code § 1788(a)(10)(A), which provided "an explicit statutory basis for transfer to a higher level of

care when the care required by the resident exceeds that which lawfully may be provided in the living unit." 2009 WL 225418, at *4 (N.D. Cal. Jan. 29, 2009).

It is undisputed that Olive Branch had only been in operations for a few months at the time Plaintiff was admitted to Olive Branch's facility. As noted in numerous records generated by Olive Branch, Olive Branch employees admitted they were uncertain they were experienced enough to handle Plaintiff's needs. Rather than unilaterally discharge Plaintiff from its facility, Olive Branch conferred with its contracted BHP (THS) to determine what course of action would be best for Plaintiff. THS agreed with Olive Branch's concerns that Olive Branch was not able to provide those services that Plaintiff required. Both THS and Olive Branch then coordinated Plaintiff's transfer to another facility. This course of action is consistent with what was provided to Plaintiff in the "Resident Rights" she acknowledged she had received on October 19, 2022.

### B. Plaintiff has produced no evidence that she objected to her transfer or otherwise requested an accommodation to remain at Olive Branch's facility.

The Federal Fair Housing Act and Arizona Fair Housing Act's definitions of prohibited discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Canady v. Prescott Canyon Estate's Homeowner Ass'n*, 204 Ariz. 91, 92-93, 60 P.3d 231, 232-233 (Ariz Ct. App. 2002). Certain provisions of Arizona's Fair Housing Act are virtually identical to those provisions included in the Federal Fair Housing Act (collectively referred to as "FHA"). *Id*. 204 Ariz. 93 at n. 3.

Implied in virtually every FHA claim under Federal or Arizona law is *that a request for an accommodation be made* by Plaintiff or Plaintiff's representatives. In *Nolan v. Starlight Pines Homeowners Ass'n*, plaintiffs did not make reasonable accommodation requests and argued that they were not required to do so. 216 Ariz. 482, 167 P.3d 1277 (Ariz Ct. App.

2007). The *Nolan* court concluded that because plaintiff had not made those requests, that defendant did not violate Arizona's Fair Housing Act. *Id.* 216 Ariz. at 488, 167 P.3d at 1283.

In the instant case, Plaintiff has produced no evidence that she objected to her transfer or otherwise requested an accommodation to remain at Olive Branch's facility. Plaintiff was provided with the means to report grievances/complaints that would have triggered Olive Branch's duty to honor Plaintiff's request for reasonable accommodations. Plaintiff, however, consented to her transfer when she signed discharge documents on November 7, 2022.

There are some exceptions where requests for accommodations are not required and discrimination is assumed (such as failure to design dwellings for those with physical disabilities). *See* A.R.S. § 41-1419.19 (E)(3) & 42 U.S.C.A. § 3604(3)(C). No such exception applies in Plaintiff's case.

### C. Olive Branch relied on THS' medical expertise as a BHP when it discharged and transferred Plaintiff to another facility.

Notwithstanding the protections afforded under the Americans with Disabilities Act, Olive Branch was permitted to discharge Plaintiff if she "pose[d] a direct threat to the health or safety of others." 42 U.S.C.A. § 12182(3). "The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence." *Bragdon v. Abbot*, 524 U.S. 624 (1998). The *Bragdon* court suggested that rather than rely on their own independent professional experience, medical providers "could consult with individual physicians as objective third-party experts." *Id.* at 650.

As noted in *McGugan v. Aldana-Bernier,* the term "discrimination" is potentially confusing in the context of medical treatment. 752 F.3d 224, 231 (2nd Cir. 2014). "Medical decisions based on experience and judgment can easily be mischaracterized as the use of stereotypes*." Costin v. Glens Falls Hospital*, 103 F.4th 946, 954 (2nd Cir. 2024).

In the instant case, Olive Branch did not unilaterally discharge and transfer Plaintiff from its facility, but instead conferred with Teri's Health Services, its contracted behavioral health provider. Ultimately, THS agreed with Olive Branch's concerns and recommended Plaintiff be transferred to a different facility that could meet Plaintiff's needs.

**D. Plaintiff has failed to produce evidence to support her allegations that Olive Branch coerced, intimidated, threatened or interfered with Plaintiff's rights.**

With regard to Plaintiff's retaliation claim, the anti-interference provisions of the Americans with Disabilities Act (42 U.S.C.A § 12203(b)), the Federal Fair Housing Act (42 U.S.C. § 3617), and Arizona Fair Housing Act (A.R.S. § 41-1491.18) are substantially similar: "It shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected [by this chapter]." *Id.*

"The Ninth Circuit [has] explained that, although § 12203 (b) contains broad language, '[c]learly, anti-inference provisions such as those contained in the FHA and ADA cannot be so broad as to prohibit 'any action whatsoever that in any way hinders a member of a protected class.'" *Strojnik v. Kapalua Land Company Ltd*, 379 F.Supp.3d 1078, 1084 (D. Hawai'i 2019) (citing *Brown v. City of Tucson*, 336 F.3d 1181 at 1192).

"In the employment context […] § 12203 'clearly prohibits a supervisor from threatening an individual with transfer, demotion, or forced retirement unless the individual foregoes a statutorily protected accommodation." *Id.* Furthermore, a plaintiff asserting such a claim must demonstrate a "distinct and palpable injury":

> "We emphasize that conclusory allegations--without more--are insufficient to state a violation [under § 12203]. An ADA plaintiff must also demonstrate that she has suffered a "distinct and palpable injury" as a result of the threat. [] That injury could consist of either the giving up of her ADA rights, or some other

injury which resulted from her refusal to give up her rights, or from the threat itself. [].”

*Id.* (internal citations omitted). The *Strojnik* case is fairly similar to the case before this court. In that case, plaintiff alleged that defendant's legal counsel "interfered, coerced, and intimidated" plaintiff when it sent legal correspondence to plaintiff threatening to file charges against plaintiff. *Id*. at 1081. The court in *Strojnik* noted that legal counsel's correspondence "[did] not threaten the filing of charges against Strojnik unless he drops his ADA claims[.]" *Id.* at 1085. In other words, defendants' legal counsel's alleged threat to file charges was not "tied to" plaintiff dropping his ADA claims.

As in *Strojnik*, Olive Branch's legal counsel's correspondence did not demand Plaintiff dismiss the complaint she filed under Arizona's Fair Housing Act. Additionally, there is no evidence that Plaintiff was a party to these communications or that she suffered a "distinct and palpable injury" as a result. Plaintiff has failed to claim that she was "forced to forgo her rights under the ADA or suffered an injury because [she] refused to forgo those rights." *Id.* at 1085. Therefore, Plaintiff's allegations of retaliation under Federal and Arizona law are conclusory and insufficient under the law.

### E. Olive Branch's disclosure that someone in the home had tested positive for HIV was permissible under the totality of circumstances.

"In determining whether a jury could reasonably find an alleged intrusion highly offensive, we have previously considered the degree of the intrusion, the context, the conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Med. Laboratory Mgmt. Consultants v. Am. Broad. Co. Inc.,* 306 F.3d 806, 819 (9th Cir. 2002) (citing *Deteresa v. Am. Broad. Cos*., 121 F.3d 460 (9th Cir. 1997).

"Although no Arizona case indicates what sort of conduct constitutes a highly offensive intrusion… [it has been] suggest[ed] that it must be an exceptional kind of prying into another's private affairs." *Id*. "In addition, any offensiveness of the alleged intrusion is mitigated by the public interest" in the information conveyed. *Id.*

In the instant case, Olive Branch operates a residential behavioral health facility where multiple staff members belonging to both Olive Branch and THS work within the home throughout both the day and night. In addition to staff members within the home, Olive Branch houses up to 10 Residents. At the time Olive Branch learned Plaintiff's HIV diagnosis, Olive Branch had no policies or procedures in place for HIV. In other words, Olive Branch believed it had a duty to tell everyone who resided and/or worked within the Olive Branch facility that (1) Olive Branch had no policies or procedures in place for HIV, and that (2) someone within the facility had tested positive for HIV.

Olive Branch's motive has been unfairly maligned by Plaintiff in this case to suggest that Plaintiff's motive was unrelated to public safety. Plaintiff was not denied HIV testing nor was she banned from outings and/or interacting with other residents.

**F. Plaintiff has failed to produce evidence that would entitle her to punitive damages in this case.**

"Punitive damages may be assessed in an FHA case "when a defendant's conduct…involves reckless or callous indifference to the federally protected rights of others." *Fair Hous. Of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

In *Southwest v. Fair Hous. Council v. WG Scottsdale, LLC*, plaintiff presented evidence that defendant knew that federal law required the accommodation of deaf residents given defendants' involvement in similar litigation (thereby making them aware of the federal requirements under federal law). 2023 WL 6820681 (9th Cir. 2023).

In the instant case, Plaintiff has provided no evidence that would support a jury finding that Olive Branch's conduct "was malicious, oppressive or in reckless disregard of the plaintiffs' rights." *Id.* Olive Branch had only been operational for a period of three months at the time Plaintiff was placed at its facility. Olive Branch had not been involved in any prior litigation or was otherwise put on notice that Olive Branch's actions or inactions were contrary to requirements under either State or Federal law.

In support of Plaintiff's purported theory that Defendant had a history of discrimination, Plaintiff requested voluminous documents from Olive Branch including sensitive personal and private medical information regarding communicable diseases reported by *other* Residents in the home.[3] Olive Branch also consented to Plaintiff's forensic search of Mr. Appleton's personal phone and email accounts.

In short, Plaintiff conducted an exhaustive search and came up with nothing. Simply put, Plaintiff cannot prove that Olive Branch acted with "reckless or callous indifference to the federally protected rights of others."

### III. CONCLUSION:

Based on the foregoing, this court should enter judgment in Defendant Olive Branch's favor.

DATED this 25th day of April, 2025.

DOYLE HERNANDEZ MILLAM

By /s/ Brandon D. Millam
William H. Doyle
Brandon D. Millam
11811 N. Tatum Blvd., Suite 2900
Phoenix, Arizona 85028
***Attorneys for Defendant***

---

[3] These documents were produced under a protective order, entered by this court on July 31, 2024 [Doc. 39]

**ELECTRONICALLY** transmitted this 25th day of April, 2025, the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic filing to the following CM/ECF registrants:

Jonathan A Dessaules, Esq.
Douglas M. Imperi, Jr., Esq.
**DESSAULES LAW GROUP**
7243 North 16th Street
Phoenix, AZ 85020
jdessaules@dessauleslaw.com
dimperi@dessauleslaw.com
*Attorneys for Plaintiff*

/s/ LaDranda T. Boudwine