Jonathan A. Dessaules, State Bar No. 019439
Douglas M. Imperi, Jr., State Bar No. 034708
**DESSAULES LAW GROUP**
7243 North 16th Street
Phoenix, Arizona 85020
Tel. 602.274.5400
Fax 602.274.5401
jdessaules@dessauleslaw.com
dimperi@dessauleslaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Hailei Joe, an individual, | No. 2:23-CV-02154-PHX-SRB |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Olive Branch Assisted Living, LLC, an Arizona limited liability company, | |
| Defendant. | |

Defendant Olive Branch Assisted Living, LLC's Motion for Summary Judgment ("Motion") is a fiction. Olive Branch's Motion is replete with vague conclusions lacking any analysis, which are often at odds with the evidence in this case. It claims Plaintiff Hailei Joe had needs it was not equipped to handle at its residential treatment facility. It never says what those needs are. It asserts Joe never objected to leaving the facility. Its own notes repeatedly confirm she did not want to leave. Olive Branch now seems to claim it was not a drug addiction treatment facility. This is contrary to all its own documents and, more importantly, had nothing to do with Joe being discharged. Olive Branch denies that it threatened Joe or that she has produced evidence to support punitive damages. Yet, there is no genuine dispute that Olive Branch's attorney sent

harassing emails threatening baseless counterclaims or that Olive Branch followed through with those threats by filing counterclaims.

We should call this case for what it is. Olive Branch discharged Joe because it learned she had HIV, and it feared her. This is the prototypical case of discrimination that the Fair Housing Act and Americans with Disabilities Act were meant to eliminate. Olive Branch's hollow, unexplained, after-the-fact excuses make it that much more apparent that this was discrimination. For those reasons, the Court should deny Olive Branch's Motion.

BACKGROUND

## I.    JOE MOVES INTO OLIVE BRANCH.

Olive Branch operated a sober living facility in Casa Grande. [Plaintiff's Controverting Statement of Facts ("CSOF") ¶1] Olive Branch marketed itself as a "residential treatment" center for persons with substance abuse disorders. [CSOF ¶¶2-3] Olive Branch provided housing, 24/7 monitoring, medication management, transportation, and group therapy. [CSOF ¶¶3-4] Olive Branch contracted with Teri's Health Services to provide services, including counseling, psychiatric, primary care, and psychological services to residents. [CSOF ¶5]

In late 2022, Joe was homeless and struggling with drug addiction. [CSOF ¶6] On October 18, 2022, Joe moved into Olive Branch's facility. [CSOF ¶7] At the time, Olive Branch knew about Joe's medical history and determined she was not a risk to herself or others. [CSOF ¶8]

## II.    JOE AND OLIVE BRANCH DISCOVER JOE IS HIV-POSITIVE.

While at Olive Branch, Joe had an HIV blood test. [CSOF ¶9] On November 4, 2022, she attended a telehealth appointment to learn the results of the test. [CSOF ¶10] Joe learned she was HIV-positive and reported to Olive Branch. [CSOF ¶11] After finding out, Olive Branch's administrator, Anissa Diaz, texted Teri and Toni from Teri's Health Services stating:

> Hailei Joe just got off with PCP and she was informed she is positive for HIV. I have never had this situation happen. Is there a specific procedure we are to follow? Are we required to discharge her?

[CSOF ¶12]

2

### III.    JOE IS DISCHARGED FROM OLIVE BRANCH'S FACILITY.

The same day Joe found out she was HIV-positive, Olive Branch's owner, Russell Appleton, and Diaz met with her and told her she would need to be discharged from Olive Branch. [CSOF ¶13] Joe told Appleton that she did not want to leave. [CSOF ¶14] Appleton told her that Olive Branch did not know what to do with her and she would need to leave. [CSOF ¶17] On November 7, 2022, Joe was discharged from Olive Branch's facility. [CSOF ¶18]

### IV.    OLIVE BRANCH THREATENS JOE IN RESPONSE TO HER FILING DISCRIMINATION COMPLAINTS.

On April 20, 2023, Joe filed a complaint with the ACRD alleging housing discrimination in violation of the FHA against Olive Branch. [CSOF ¶19] During the pendency of the ACRD's investigation, the statute of limitations for Joe to file suit was set to expire. Accordingly, Joe filed suit alleging claims for: (1) violation of state and federal FHA for discriminating in the terms and conditions of her housing at the facility; (2) violation of the ADA for discriminating on the basis of disability with regard to services at a place of public accommodation; and (3) public disclosure of private facts for publicly disclosing Joe's HIV status to others. [Doc. 1 (Complaint) ¶¶ 23-48] After filing suit, the Phoenix New Times ran an article about the lawsuit wherein it reproduced many of the claims raised in Joe's lawsuit. [CSOF ¶20]

Olive Branch retained Ely Sluder to represent it in the ACRD matter. [CSOF ¶21] Sluder sent Joe's counsel a series of emails making various accusations and threating to file defamation counterclaims if Joe did not drop her claims. [CSOF ¶¶23-24] When Olive Branch filed its answer, it also asserted counterclaims for defamation. [Doc. 11 (Answer) pp. 6-7] In response, Joe supplemented her Complaint to assert claims for retaliation under state and federal FHA and the ADA. [Doc. 19 (Supplement Complaint)] Shortly after, Olive Branch voluntarily dismissed its defamation counterclaim with prejudice. [Doc. 36 (Order for Dismissal With Prejudice of Counterclaims)]

Discovery in this matter is complete. Joe took the deposition of Anissa Diaz and Russell

1 Appleton. Olive Branch took Joe's deposition. The parties filed cross motions for summary

2 judgment.

3                                          **STANDARD OF REVIEW**

4      A party seeking summary judgment "always bears the initial responsibility of informing

5 the district court of the basis for its motion, and identifying those portions of 'the pleadings,

6 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

7 which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Co. v.*

8 *Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(c). The moving party without the

9 ultimate burden of persuasion at trial must "either produce evidence negating an essential element

10 of the nonmoving party's claim or defense or show that the nonmoving party does not have enough

11 evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire &*

12 *Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A court must resolve

13 all reasonable doubts regarding whether a genuine factual issue exists against the moving party.

14 *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). The court also must

15 construe all inferences reasonably drawn from the facts in the light most favorable to the

16 nonmoving party. *T.W. Elec. Serv. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

17 1987).

18      "The standards regarding disparate treatment claims under the ADA are typically identical

19 [to the FHA], and courts accordingly interpret them in tandem." *Pacific Shores Props., LLC v.*

20 *City of Newport Beach*, 730 F.3d 1142, 1157 (9th Cir. 2013) (cleaned up). The Arizona Fair

21 Housing Act and Federal Fair Housing Act are substantially the same and interpreted using the

22 same precedent. *See Canady v. Prescott Canyon Estates Homeowners Ass'n*, 204 Ariz. 91, 93, ¶ 9

23 n. 3 (App. 2002). When a plaintiff alleges intentional discrimination "any indication of

24 discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder."

25 *McGinest v. GTE Serv. Co.*, 360 F.3d 1103, 1124 (9th Cir. 2004).

26

4

**ARGUMENT**

## I.  ARIZONA'S ADMINISTRATIVE CODE CONDEMNS OLIVE BRANCH'S STATED PRETEXT FOR EXPELLING JOE.

The Arizona Administrative Codes states, "[a]n administrator shall ensure that a resident is discharged from behavioral health residential facility when the resident's treatment needs are not consistent with the services that the behavioral health residential facility is authorized and able to provide." Ariz. Admin. Code § 9-10-709(C). The Code also states that residents in a Behavioral Health Residential Facility have the right: "Not to be discriminated against based on race, national origin, religion, gender, sexual orientation, age, disability, marital status, or diagnosis." Ariz. Admin. Code. § 9-10-711(E). Olive Branch suggests the Arizona Administrative Code supports its actions in expelling Joe. To the exact contrary, Arizona law frowns upon Olive Branch's actions. In arguing that the code applies to this case, Olive Branch both mischaracterizes Joe's needs from Olive Branch and doubles down on the very behavior that constitutes the discrimination for which it now faces civil recourse.

Olive Branch makes a blanket statement that it "was not able to provide those services that Plaintiff required." [Doc. 71 p. 11, l. 9] Olive Branch fails to identify any needs Joe had which the Arizona Administrative Code would require discharge. The only specific needs Olive Branch identifies anywhere in its brief is treatment for Narcotics and PTSD. [*See* Doc. 71 p. 3, ll. 13-14]. Olive Branch now seems to be claiming it was only set up for treating alcoholics and no other types of substance abusers. [Doc. 71 pp. 6-7] Throughout Olive Branch's policies, procedures, and marketing materials it describes itself as a center that "will provide support, screening/assessment and access to services for residents with diagnosed mental health disorder(s) and co-occurring disorders of substance abuse and/or addiction." [CSOF ¶¶2-3] Teri's contract with Olive Branch states: "Teri's Health Services provides training to all their counselors on topics of addiction counseling, addiction interventions, SMI interventions and therapeutic approaches, and evidenced based treatment protocols for children, teen, and adult populations." [CSOF ¶25]

Further, Olive Branch admitted Joe for two weeks despite Olive Branch's knowledge that she needed treatment for mental health and narcotics use at the time of admission. [CSOF ¶¶6-8, 18] So, for the only specific needs Olive Branch has identified, there is no genuine dispute that Olive Branch had the capabilities to address those needs. Olive Branch discharged Joe on the day it learned she had HIV. It is clear Joe was discharged for the HIV, not because of some other unidentified "needs." The ACRD clearly agreed since it found there was reasonable cause to believe Olive Branch discriminated. Contrary to Olive Branch's suggestion, the Arizona Administrative Code does not provide it a safe haven for wrongfully denying someone services.

## II.    OLIVE BRANCH FAILED TO MAKE OBVIOUS ACCOMMODATIONS.

Among the forms of prohibited discrimination under Federal and Arizona Fair Housing Acts is the "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Canady v. Prescott Canyon Estate's Homeowner Ass'n*, 204 Ariz. 91, 92-93 (App. 2002). A request for a reasonable accommodation does not need to be in writing, use the providers specified forms, or invoke the magic words "reasonable accommodation." Joint Statement of The Department of Housing and Urban Development and the Department of Justice, *Reasonable Accommodations Under the Fair Housing Act*, Section 12 (May 14, 2004); *see also Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 313 (3rd Cir. 1999) (ADA context). Contrary to what Defendant argues, a failure to accommodate a claim does not hinge on an implied requirement that Plaintiff explicitly request such accommodation. [Doc. 71 p. 11, ll. 22-23] "It is axiomatic that an entity's duty to look into and provide a reasonable accommodation may be triggered when the need for accommodation is obvious, even if no request has been made." *Bax v. Doctors Med. Ctr. Of Modesto, Inc.*, 52 F.4th 858, 869 (9th Cir. 2022) (cleaned up) (deaf patient alleged hospital did not provide effective means of communication); *see also Humphrey v. Mem. Hosp. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) ("Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an

interactive process with the employee to identify and implement appropriate reasonable accommodations.").

Here, Olive Branch had a duty to accommodate Joe without a formal written complaint. Olive Branch acknowledges that it knew about Joe's disability at the time of her discharge. [Doc. 71 pp. 5-6] It acknowledges that it had all the means to deal with bloodborne pathogens, like HIV—masks, gloves, monitoring. [CSOF ¶¶26-27] Olive Branch could also obtain Joe's prescription for antiretrovirals. [CSOF ¶28]

In its Motion, Olive Branch never explains what accommodations it was incapable of providing. Instead, Olive Branch relies entirely on a false premise that Joe was required to object to her transfer and specifically request an accommodation to stay at the facility. Olive Branch contends Joe was required to fill out a formal grievance complaint and uses her failure to do so as some sort of fictitious failure to exhaust administrative remedies. [*See* Doc. 71, p. 12, ll. 3-7] First, contrary to Olive Branch's suggestion, Joe objected to her discharge directly to Appleton. [CSOF ¶14] That is consistent with Olive Branch's grievance procedure, which provides that a resident shall discuss the issue with the manager. [CSOF ¶29] Second, an FHA plaintiff's failure to fill out a formal written complaint is not grounds to bar an action. Olive Branch offers no authority and undersigned is not aware of any authority stating an FHA plaintiff must fill out the provider's forms to request an accommodation. Third, the case Olive Branch relies on, *Nolan v. Starlight Pines Homeowners Ass'n*, did not involve any allegations that the defendant was aware of accessibility issues or the need for accommodations prior to the suit. 216 Ariz. 482, ¶ 22 (App. 2007). Here, Olive Branch knew Joe was HIV-positive. It knew it was discharging her. The limited accommodations Joe would need to stay—the adoption of universal precautions—was obvious. Therefore, under any view of the facts, Olive Branch cannot be absolved of its failure to accommodate Joe based on an already dubious claim that Joe failed to object to Olive Branch's discrimination.

As discussed in greater detail in Joe's Motion for Partial Summary Judgment, her claim for

7

discrimination is based on Olive Branch's disparate treatment in wrongfully denying her housing and services—not just a failure to accommodate. [*See* Doc. 73 pp. 8-10] However, even on the failure to accommodate aspect of Joe's discrimination claim, there is enough evidence in the record to show Joe requested an accommodation and her need for an accommodation was obvious. Therefore, Olive Branch is not entitled to summary judgment on this issue.

### III.    OLIVE BRANCH FAILED TO RAISE DIRECT THREAT AS A DEFENSE OR PRESENT OBJECTIVE MEDICAL EVIDENCE TO SUPPORT ITS POSITION.

The FHA and ADA do not require a facility to provide housing or services to an individual "where such individual poses a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3). "Direct threat" means "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." *Id.* A defendant must affirmatively allege "direct threat" as an affirmative defense in its pleadings. *See* Fed. R. Civ. 8(c) (requiring a party to affirmatively state any affirmative defense); *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1027 (9th Cir. 2003) (recognizing direct threat is an affirmative defense on which the defendant bears the burden of proof); *see also Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005) ("Under the Federal Rules of Civil Procedure, a party, with limited exceptions, is required to raise every defense in its first responsive pleading, and defenses not so raised are deemed waived.") Olive Branch lists 25 affirmative defenses in its Answer. [Doc. 11 p. 5] None of which are "direct threat." Accordingly, Olive Branch has waived "direct threat" as a defense.

Nevertheless, Olive Branch also fails to present any objective evidence that Joe was a direct threat. "The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence." *Bragdon v. Abbot*, 524 U.S. 624, 649 (1998). Olive Branch cites *Bragdon* for the proposition that medical providers "could consult with individual physicians as objective third-party experts." [Doc. 71 p. 12, ll. 16-21]. Olive Branch

has taken the quoted language out-of-context and misrepresents an open question from another case as part of the *Bragdon* Court's opinion. In reality, the *Bragdon* Court stated:

> As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability. To use the words of the question presented, petitioner receives no special deference simply because he is a health care professional. It is true that *Arline* reserved "the question whether courts should also defer to the reasonable medical judgments of private physicians on which an employer has relied." 480 U.S., at 288, n. 18, 107 S.Ct., at 1131, n. 18. **At most, this statement reserved the possibility that employers** could consult with individual physicians as objective third-party experts. It did not suggest that an individual physician's state of mind could excuse discrimination without regard to the objective reasonableness of his actions.

524 U.S. at 649-50 (emphasis added). It then states: "Our conclusion that courts should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments does not answer the implicit assumption in the question presented, whether petitioner's actions were reasonable in light of the available medical evidence." *Id.* at 650. It continued: "In assessing the reasonableness of petitioner's actions, the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority." *Id.*

Courts have entered summary judgment against a service provider who claims its denial of services was based on safety concerns without making an individualized inquiry into the patient's needs or risks presented. *United States v. Asare*, No. 15-CV-3556, 2018 WL 2465378, at * 5 (S.D.N.Y. June 1, 2018) (cosmetic surgeon screened out anyone taking antiretrovirals); *Sumes v. Andres*, 938 F. Supp. 9, 12 (D.C. 1996) (doctor refused to treat deaf patient and referred her to a "higher risk" facility on that grounds that he did not feel qualified to treat the plaintiff).

Olive Branch, once again, offers nothing of substance. It claims it was justified in discharging Joe because "THS agreed with Olive Branch's concerns and recommended Plaintiff be transferred to a different facility that could meet Plaintiff's needs." [Doc. 71 p. 13, ll. 3-4] It does not explain how Joe posed a direct threat to the health and safety of others. It does not explain

9

how that threat was significant or could not be addressed by modifications to its policies or procedures. Olive Branch makes vague references to "Plaintiff's recent suicidal attempts and ongoing PTSD." [Doc. 71 p. 7, ll. 12-17] Yet, it does not go on to explain how either of those things are related to the health and safety of others. Olive Branch does not offer any objective medical evidence at all. Instead, it relies on Appleton's secondhand account of Teri's agreement to Olive Branch's concerns. At best, Olive Branch is relying on the subjective judgment of medical professionals. Olive Branch does not explain the basis of those subjective judgments or how they are based on objective medical evidence. Put another way, there is nothing for this Court to verify whether Teri's judgment was correct or discriminatory. Like the providers in *Asare* and *Sumes*, Olive Branch does not offer evidence that it performed an individual inquiry into Joe's condition, her needs, how she presented a risk, the degree of any risk, and how continuing to provide services to her at its facility would endanger others. To the contrary, Appleton made a blanket statement to the ACRD that he would not house anyone with Joe's disabilities. [CSOF ¶30] For Olive Branch to wipe its hands of the matter and rely solely on THS' judgment is no different that Olive Branch reaching its own unilateral conclusion that a risk existed. There is a sweeping breadth of publicly available information on both treatment and the risks associated with HIV which directly contradicts the proposition that Joe presented a direct threat. [*See* Doc. 73 pp. 11-12].

Olive Branch's decision to consult its own vendor, THS, before discharging Joe does not insulate it from liability. Olive Branch has not offered any evidence that Joe was a direct threat. Accordingly, its direct threat defense fails as a matter of law.

## IV.    THE FHA AND ADA DO NOT SUPPORT OLIVE BRANCH'S EFFORTS TO EXTORT JOE.

The FHA and ADA make it "unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment" of their rights under each respective statute. 42 U.S.C. § 3617. Unlawful threats or intimidation include filing baseless counterclaims. *Walker v. City of Lakewood*, 272 F.3d 1114, 1124-25 (9th Cir. 2001) (denying summary judgment in favor of City

10

on FHA retaliation claim where City filed frivolous third-party complaint against a housing organization); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 343 (4th Cir. 2008) (finding employer's baseless fraud action was retaliatory); *Torres v. Gristede's Operating Co.*, 2008 WL 4054417, at * 17 (S.D.N.Y. 2008) (holding groundless counterclaims are actionable retaliation due to their "in terrorem effect."). Joe's coercion, intimidation, threat, or interference claim is straight forward. Olive Branch threatened to file baseless counterclaims and did, in fact, file baseless counterclaims in response to Joe filing an FHA complaint with the ACRD and a civil lawsuit. [*See* Doc. 73 pp. 15-17]

### A.    Olive Branch Made It Clear That Its Threats Were Intended to Scare Joe and Force Her to Drop Her Claims.

Olive Branch contends Joe's claims must fail because its counsel did not demand Joe dismiss her FHA complaint with the ACRD. In support, Olive Branch cites to *Strojnik v. Kapalua Land Company Ltd.*, 379 F. Supp. 3d 1078, 1084 (D. Haw. 2019) Yet, in *Strojnik*, the correspondence at issue stated "the State Bar of Arizona will be interested to learn of your attempt to continue" an extortionate scheme that previously resulted in the plaintiff being disbarred. 379 F. Supp. 3d at 1081. The *Strojnik* court found there was no threat because the defendants did not give the plaintiff an option to avoid referral to the state bar in exchange for dropping his claims. *Id.* at 1086. The facts before this court are not in fact "fairly similar" to those in *Strojnik*. The emails from Olive Branch's counsel explicitly demand Joe drops her claims or else. On November 13, 2023, Defendant's general counsel Ely Sluder sent the following email in relevant part:

> If my client is forced to hire litigation counsel to defend this nonsense, he's going to countersue for defamation per se, seek attorneys fees, and Rule 11 sanctions against you. I'm not threatening you because it's certainly not going to be me doing any of it. I'm just telling you the truth about my client, who I've had for more than a decade. He's a hard-headed Navy squid, just like my father. (#GoArmy.)

Do you defend countersuits on contingency?

On November 21, 2023, Mr. Sluder followed up with another email:

> My client has ample funds to afford a litigation attorney to countersue your client

into bankruptcy, then pursue a judgment as non-dischargeable, which is exactly what is going to happen if this lawsuit isn't dismissed when the AG determines that the fair housing laws don't apply.

[CSOF ¶¶23-24] It is unclear if Olive Branch is trying to say that since Sluder threatened counterclaims, his threats are only tied to Joe's civil lawsuit and not the ACRD complaint. Even giving Olive Branch the most generous inference, it is a distinction without difference. Filing a civil lawsuit is also a protected activity under the ADA and FHA. *See Pardi v. Kaiser Foundation Hosp.*, 389 F.3d 840, 850 (9th Cir. 2004) ("Pursuing one's rights under the ADA constitutes a protected activity.").

## B. Joe's Suffered a Distinct and Palpable Injury.

In asserting a claim under 42 U.S.C. § 3617 and 42 U.S.C. § 12203, a plaintiff must demonstrate a "distinct and palpable injury." *Walker v. City of Lakewood*, 272 F.3d 1114, 1123 (9th Cir. 2001). Olive Branch contends Joe did not suffer a distinct and palpable injury because she was not copied on any of Sluder's emails. [Doc. 71 p. 9, ll. 17-20] A "distinct and palpable injury" includes being forced to defend baseless claims in a lawsuit. *Walker*, 272 F.3d at 1119, 1124-25 (housing organization spent time and money defending frivolous suit). It also includes feelings of stress, harassment, and pressure because of the defendant's actions. *Brown v. City of Tucson*, 336 F.3d 1181, 1193 (9th Cir. 2003). Olive Branch's argument ignores that it actually filed the counterclaims that Sluder threatened. Joe would be necessarily apprised of the counterclaims—and Sluder's threats—before authorizing undersigned to defend her. *See* E.R. 1.4 (requiring attorneys to fully and fairly disclose to their clients all facts that materially affect their rights and interests). Regardless, as a matter of undisputed fact, she was forced to spend time defending the counterclaims. [*See* Doc. 19; CSOF ¶32] And she suffered emotional distress because Olive Branch was trying to coerce her to drop her claims. [CSOF ¶¶33-36] Both are distinct and palpable injuries. The issue of the actual calculation of damages remains a factual dispute for the finder of fact.

1  **V.    OLIVE BRANCH'S DISCLOSURE OF PLAINTIFF'S CONDITION WOULD BE**
2  **HIGHLY OFFENSIVE TO ANY REASONABLE PERSON.**

3      A person is liable for publicly disclosing the private life of another if the matter publicized

4  is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate

5  concern to the public. Restatement (Second) of Torts § 652D. As Defendant points out, the

6  question of whether an intrusion is highly offensive is determined by "the degree of the intrusion,

7  the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives

8  and objectives, the setting into which he intrudes, and the expectations of those whose privacy is

9  invaded." *Med. Laboratory Mgmt. Consultants v. Am. Broad. Co. Inc.*, 306 F.3d 806, 819 (9th

10  Cir. 2002). The public disclosure of someone's HIV status would be highly offensive to a

11  reasonable person. *See Doe v. Beard*, 63 F. Supp. 3d 1159, 1170 (C.D. Cal. 2014) ("[E]ven

12  negligent disclosure of HIV-positive status can be an egregious violation of social norms if it

13  causes harm—including psychological harm—to the patient."). Some state courts have held a

14  person's HIV-status is per se not a matter of legitimate concern to the public because a person's

15  health and private life are inherently private matters. *Multimedia WMAZ, Inc. v. Kubach*, 212 Ga.

16  App. 707, 710 (Ga. App. 1994); *Borquez v. Robert C. Ozer, P.C.*, 923 P.2d 166, 173 (Co. App.

17  1995) (reversed on other grounds).

18      Olive Branch held a group meeting where it told everyone in its facility about Joe's HIV-

19  diagnosis and that the facility was no longer safe. [CSOF ¶¶37-38] There are few things more

20  private for a person than their medical information. Joe had a reasonable expectation that Olive

21  Branch would protect her medical information. [CSOF ¶44] This is especially true given Olive

22  Branch's procedures require that it protect resident's medical information. [*Id.*] Joe was

23  devastated when Olive Branch announced her status. [CSOF ¶¶46-47] She never expected to

24  become a pariah at a place that was supposed to be helping her. [CSOF ¶¶48-49]

25      Olive Branch once again relies on conclusory denials of guilt to buttress its motion for

26  summary judgment. It claims it did not have the "policies or procedures in place for HIV." [Doc.

13

71 p. 15, ll. 8-12] It does not identify what policies it needed. Olive Branch states it "believed it had a duty to tell everyone" at the facility that someone had HIV in the name of "public safety." [Doc. 71 p. 15, ll. 13-15] It does not explain how telling everyone, even other residents, would support public safety. The obvious subtext is Olive Branch feared Joe would spread HIV around the facility. It was excluding her because she has HIV. Olive Branch had no reason to believe Joe was a danger to others. Whether through ignorance or prejudice, this is the very same discrimination that forms the basis for Joe's lawsuit. A reasonable fact finder could find Olive Branch's disclosure was highly offensive and served no legitimate public interest.

## VI.    OLIVE BRANCH'S RECKLESS DISREGARD OF JOE'S RIGHTS SUPPORTS HER CLAIM FOR PUNITIVE DAMAGES.

If a court finds "that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages. . ." 42 U.S.C. § 3613. Punitive damages are available where the defendant's conduct is motivated by evil motive or intent, or involves "reckless or callous indifference to the federally protected rights of others." *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). Retaliation against a person for exercising their protected rights can be sufficient evidence that the defendant's actions were willful or motivated by malice. *See Broome v. Biondi*, 17 F. Supp. 2d 211, 228 (S.D.N.Y. 1997) (punitive damages appropriate where housing cooperative retaliated against member by rejecting sublease, issuing a notice of default, and filing two lawsuits.). On the other hand, [r]eckless indifference does not require the defendant to "engage in conduct with some independent, 'egregious' quality before being subject to a punitive award." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 538 (1999). Under the "reckless indifference" standard, punitive damages are warranted when a defendant discriminates in the face of a perceived risk that its actions will violate federal law. *Id.* at 536. Punitive damages have been upheld in FHA cases where the defendant knew it was illegal to discriminate and had a policy of excluding persons in a protected class. *Combs*, 285 F.3d 899, 907 (apartment complex owner evicted black tenant, told testers that he no longer rented to black

people, and told white tenants he wanted the complex to be all white); *U.S. v. Rupp*, 68 F.4th 1075 (8th Cir. 2023) (landlord evicted tenant-mother two weeks after giving birth, her recovery was hindered by being forced to move out, the eviction was abrupt despite the family's pleas for more time, and the landlord used a lease with a no-children clause).

Here, punitive damages are appropriate under the evil motive and reckless indifference standards. Olive Branch tried to extort Joe. It referred to her as "mentally unstable," compared her to a meth dealer, accused her of smearing fecal matter on its walls, and threatened her with financial ruin if she did not comply with its demands. Olive Branch wanted to intimidate Joe. Its actions were clearly motivated by malice. Olive Branch makes a bizarre claim that Joe has "conducted an exhaustive search [to find evidence of its reckless disregard] and came up with nothing." [Doc. 71 p. 16, ll. 12-14] Putting aside Olive Branch's explicit threats, there is ample evidence showing Olive Branch disregarded Joe's rights. Based on its license, its policies, and its resident manual, it knew state and federal law prohibited discrimination on the basis of disability. [CSOF ¶50] Olive Branch abruptly discharged Joe within hours of learning she was HIV-positive. Its sudden eviction uprooted Joe from the new stability and programming she received at Olive Branch's facility. Appleton has admitted to the ACRD that he would never house someone with Joe's disabilities. Olive Branch has made it clear that it has no regard for Joe's federally protected rights. Accordingly, a reasonable juror could determine an award of punitive damages is warranted in this case.

## CONCLUSION

Olive Branch asks for summary judgment without explaining itself. It takes the position that all its actions were justified, without question, and Joe cannot sustain her burden at trial. But on closer scrutiny, it is Olive Branch who has failed to establish evidence to support any of its defenses. The reality is that it expelled Joe due to outdated stereotypes about HIV/AIDS. Then it tried to intimidate her when she complained. Given Olive Branch has failed to create a genuine dispute of material fact, backed by objective evidence, the Court should enter partial summary

judgment in Joe's favor. At the least, it should deny Olive Branch's Motion in full.

DATED this 27th day of May 2025.

DESSAULES LAW GROUP

By: /s/ Douglas M. Imperi, Jr.
Jonathan A. Dessaules
Douglas M. Imperi, Jr.
*Attorneys for Plaintiff*

16